# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

RENEE KNAPKE,                          :

      Plaintiff,                    :

                  Case No. 3:13cv00399

 vs.                                   :

                  District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                     :     Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,               :

      Defendant.                    :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

      Plaintiff Renee Knapke brings this case challenging the Social Security Administration's denial of her application for Disability Insurance Benefits.  She asserts here, as she did before the administration, that she has been under a benefits-qualifying disability – starting on August 15, 2008 – due to significant low-back pain plus swelling, weakness, and pain in her ankles.

      The case is presently before the Court upon Knapke's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #12), Knapke's Reply (Doc. #13), the administrative record (Doc. #7), and the record as a whole.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

## II.     Background

### A.     Knapke's Vocational Profile and Testimony

Knapke was 45 years old on her alleged disability onset date, placing her in the category of a "younger person" for purposes of resolving her Disability Insurance Benefits. *See* 20 C.F.R. §404.1563(c).  She has a high-school education and attended college for two years without earning a degree.  Her past relevant employment includes work as an insurance salesperson, grocery clerk, preschool teacher, and telemarketer.  (Doc. #7, PageID at 1730).[2]

At her administrative hearing in April 2012, Knapke testified that she is married. Her husband is retired from the Air Force and continues to work for the government.  They have one dependent child.

Knapke testified that at the time she became disabled from work activities (August 15, 2008), she was experiencing worsening problems with her lower back, ankles, and feet. She had been experiencing back pain for eight years.  She explained, "[T]he ankle and the feet problems became ... chemotherapy-related from surviving breast cancer that year, a lot of surgeries, a lot of radiation, a lot of chemotherapy treatments ...."  *Id*. at 1572, 1581-82. She understands, based on what a podiatrist has told her, that her bone density or bone mass index is less than everybody else.  *Id*. at 1582-83.  Knapke was diagnosed with breast cancer in January 2008.  Following surgery and multiple courses of chemotherapy and radiation,

---

[2] Citations to the PageID #*s* in this Report, unless otherwise indicated, are found in the First Certified Administrative Record. (Doc. #7).

2

she was free of malignancy in April 2009.  *See* Doc. #9 at 2865-86 (record citations therein).

Knapke's back pain is in her lower left side; it will gradually go up her right side. She testified, "[T]he way the doctor explained it to me, [sic] a big knotted muscle, and it'll go over to the right side, it'll just spread.  It just comes out."  (Doc. #7 at 1573).  She was told, at some point, there was nothing that could be surgically done about her back pain. She was told that it is "a sciatic problem, a piriformis muscle problem ...."  *Id*., 1574.  Her low-back pain is constant and daily.

Knapke indicated that both her ankles were extremely weak, her left weaker than her right.  She needed to use a cane and a brace or else she would "trip frequently."  *Id.* at 1575. The pain in her left ankle was constant after the fracture she suffered in March 2011.  *Id*. at 1580.  She does ankle-strengthening exercises, as a podiatrist recommended.  A physician prescribed a cane for her to use, and she used it daily.  A physician also prescribed a left-ankle brace to provide her more stability.  *Id*. at 1595.

Knapke's prescription pain medication do not help her, except for Vicodin.  She estimated that with medication, her pain is about a five, on a scale of zero to ten (zero = no pain; ten = worst pain imaginable).  (Doc. #7 at 1580).  The medications cause her side effects, mainly drowsiness/dizziness but also dry mouth, lack of concentration, and decreased memory.  *Id*. at 1578.  By the date of the ALJ's hearing, she had been receiving treatment at a pain clinic for seven years.  Treatment has included injections, physical

therapy,  and "an intramuscular procedure ..." with no relief from her pain.  *Id*. at 1579.

 She is most comfortable in the prone position, lying down.  She can sit for five minutes if she does not squirm and for fifteen minutes if she squirms.  Sitting or standing exacerbates her pain.  She estimates that she can walk about one-half block at a time before ankle and back pain stops her.  She can stand for about ten minutes.  *Id*., PageID at 1584.  Her ankles swell when she stands for more than forty-five minutes at a time.  She relieves this swelling by lying down with her ankles higher than her head for about fifteen to thirty minutes.  *Id*. at 1595.  She can lift up to ten pounds and climb steps with difficulty.

 As to her daily activities, she cooks "some" at home.  She does not wash dishes or clothes.  She does not make beds or visit friends.  She occasionally sweeps, mops, or vacuums.  She occasionally goes to the movies.  Her husband does most of the shopping; she does a little grocery shopping.  She attends church every week, which requires her to sit in pain for about forty minutes.  Her hobbies include crocheting and reading, although she can only read for fifteen minutes at a time do to problems concentrating.  She does not participate in sports, exercise, or do yard or garden work.  She traveled to Mississippi in April 2011.  Her husband drove.  Sitting in the car was [p]retty horrendous" for her.  *Id*. at 1594.  They stopped quite frequently, and she sometimes reclined in the back car seat.  She noted, "it's like you walk to alleviate the back pain and then you've got to sit to alleviate the ankle pain." *Id*.

 Knapke's son is in Boy Scouts, so once a month she tries to do volunteer work for

them.  She explained that this may include researching something on the computer or typing an email "or something to that effect."  *Id*. at 1593.

> At the conclusion of her testimony, Knapke was asked, and she answered, as follows:

> Q.    [I]f there were a job that you could sit at, but you could alternate between sitting and standing if you needed to throughout the day to relieve the pain that you're describing, do you think you could do that type of work?

> A.    No, because I need to alternatively also put my feet up to relieve the swelling and ... when I stand my, my ankles hurt.  When I sit, my back hurts.  So alternating alleviates pain in one section, it causes increased pain in the other section.

*Id*. at 1596.

## B.    Drs. Pema's Opinions

Knapke's treating podiatrist, Dr. Pema, competed a brief questionnaire at the request of the Social Security Administration in December 2010.  (Doc. #7 at 2648-49).  He reported that Knapke's pain and certain sensory deficits ("posterior tibial ... deep peroneal ..."), had been chronic since February 2009.  *Id*. at 2649 (illegible handwriting omitted).

In August 2011, Dr. Pema reported that he had diagnosed Knapke with a non-displaced fracture of her left tibia and fibular malleolus, and peroneus brevis tear.[3]  The bones involved in Knapke's ankle fracture – her medial and lateral melleolus – had not formed a solid union.  He projected that a solid union of Knapke's ankle bones in six months (March 2012).  *Id*. at 2842.

---

[3]  "The peroneal tendons run on the outside of the ankle just behind the bone called the fibula...."
http://aofas.org (American Orthopaedic Foot & Ankle Society; search "peroneal tendon").

Choosing from a scale designated, "None, Mild, Moderate, Severe, Extreme," Dr. Pema noted that Knapke suffers from "severe" pain.  (Doc. #7 at 2843).  He opined that Knapke could stand for fifteen minutes at a time; sit for one hour at a time; work for one hour per day; occasionally or frequently lift up to five pounds; and occasionally need to elevate her legs during an eight-hour workday.[4]  *Id*. at 2843.  Next to these opinions in the form he completed, Dr. Pema noted, "To be determined by functional capacity test."  *Id*. Dr. Pema further opined that Knapke could not walk a block at a reasonable pace on a rough or uneven surface, walk enough to shop or bank, or climb a few steps at a reasonable pace with the use of a handrail.  Next to these opinions, Dr. Pema noted, in part, "To be determined by functional capacity test."  (Doc. #7 at 2849).

The functional capacity test Dr. Pema referred apparently took place on September 6, 2011, at the Drayer Physical Therapy Institute.  Knapke underwent "a Functional Capacity Evaluation to assess [her] current level of physical capacities in order to determine [her] ability to return to work."  *Id*. at 2733.  At some point, Dr. Pema initialed this last page of the report from this functional capacity test.

On March 27, 2012, Dr. Pema noted – "revised" – at the end of his previously completed August 2011 opinions.  (Doc. #7 at 2843).

**C.**     **Dr. Danopulos's Examination Report**

In February 2011, Dr. Danopulos performed a one-time examination of Knapke at

---

[4] The form Dr. Pema completed defines "occasionally" as "2.5 hours" and "frequently" as "2.5 to 5.0 hours."  (Doc. #7, PageID at 2849).

the request of the Ohio Bureau of Disability Determinations.  *Id*. at 2662-72.  Dr. Danopulos

reported, in part:

> Upper and lower extremities reveals full range of motion.  Both feet were
> painful by palpation.  The left foot on the lateral aspect on the foot.  The right
> on the dorsal side of the metatarsal foot.  She was walking abnormally bar
> foot on the corridor examining room.  No edema, stasis dermatitis, or
> superficial varicose veins.  No brawn edema or ulcerations.  Pulses were 4+ at
> the femorals, popliteals, 2+ at the dorsalis pedis and posterior tibials
> bilaterally.
>
> Musculoskeletal evaluation revealed a normal gain without ambulatory aids.
> Spine was painful to pressure in the low lumbo/sacral area.  She was getting
> on and off the examining table without difficulty.  Bilateral straight leg raising
> was normal.  LS spine motions were slightly restricted and painful.  There was
> no evidence of nerve root compression or peripheral neuropathy.

(Doc. #7 at 2666).  Dr. Danopulos also observed that Knapke's "[s]ensory examination was

normal for light touch, pain, and proprioception vibration.  Deep tendon reflexes were

diminished considerable and equal bilaterally in the upper and lower extremities."  *Id*.  Dr.

Danopulos further wrote, "The objective findings were: 1) lumbar spine arthralgias, rule out

early lumbar spine arthritic changes, 2) bilateral feet neuralgias, 3) mature-onset non-insulin

dependent well-controlled diabetes, and 4) history of acid reflux being managed properly."

*Id*. at 2667.

Dr. Danopulos opined, "[Knapke's] ability to do any work-related activities is

affected in a negative way from her lumbar spine arthralgias rule out early lumbar spine

arthritic changes, previous breast cancer treated properly without recurrence, mature-onset

well-controlled diabetes, and bilateral feet neuralgias."  *Id*.

7

### III.   **"Disability" Defined and the ALJ's Decision**

The Social Security Administration provides Disability Insurance Benefits (DIB) to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security lexicon.[5] 42 U.S.C. §423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

ALJ McNichols found that Knapke was not under a benefits-qualifying disability by applying the Social Security Administration's five-Step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)(4).  Steps two, three, and four are the most significant in this case.

At Step two, the ALJ concluded that Knapke had several impairments, namely, "lumbar spine arthralgias; and bilateral ankle and foot arthralgias."  (Doc. #7 at 1549).

At Step three, the ALJ concluded that Knapke impairments or combination of impairments did not meet or equal the criteria in the Commissioner Listing of Impairments, including the Listings.  (Doc. #7 at 1553).

At Step four, the ALJ concluded that Knapke retained the residual functional

---

[5] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423.

capacity[6]:

> to perform at least sedentary work ... subject to: no climbing of ladders, ropes, and scaffolds; no balancing; occasional bending, squatting, stooping, kneeling, crouching, and crawling; no exposure to hazards such as dangerous machinery or unprotected heights; the opportunity to alternate between sitting and standing at 30-minute intervals; no work on uneven surfaces; no repetitive use of foot controls; no requirement to maintain concentration on a single task for longer than 15 minutes at a time; and use of a cane to ambulate.

*Id*. (internal citation omitted).  The ALJ also concluded at Step four that Knapke's "allegations of disability are not supported by substantial medical evidence or clinical findings.  Such allegations are found to be disproportionate and less-than-credible."  (Doc. #7 at 1557).

Knapke's physical work abilities and limitations, and other considerations, ultimately led the ALJ to conclude that she was not under a benefits-qualifying disability.  *Id*. at 1557-59.

## IV.  **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

---

[6] A social-security claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.**     **Discussion**

    **A.**     **The Parties' Main Contentions**

Knapke asserts four main errors in the ALJ's decision:

1.     The ALJ's rejection of the opinions of treating source Dr. Pema is
unsupported and contrary to the Commissioner's regulations.

2.     The ALJ errs in his consideration of the results of [Knapke's] September 2011
comprehensive work assessment.

3.     The ALJ's findings regarding [Knapke's] daily activities and her credibility
are without substantial evidentiary support.

4.     The ALJ's decision is not supported by substantial evidence and the
Commissioner's position is not substantially justified.

(Doc. #9 at 2871).

The Commissioner contends that the ALJ reasonably and accurately weighed Dr.

Pema's opinions and reasonably gave significant weight to Dr. Danopulos's opinions, even

though Dr. Danopulos did not provide specific limitations on Knapke's exertional-work

abilities.  The Commissioner also contends that the record is replete with evidence

supporting the ALJ's finding that Knapke's assertions were not entirely credible.

    **B.**     **Drs. Pema and Danopulos**

Social Security Regulations recognize several different categories of medical

sources: treating physicians, nontreating yet examining physicians, and nontreating record-

reviewing physicians. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has
> examined a claimant is given more weight than that from a source who has not

11

performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing, in part, 20 C.F.R. §404.1527(c)(1), (d) (eff. April 1, 2012)).

A treating source's opinion is given controlling weight under the treating-physician rule when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Gayheart*, 710 F.3d at 376; *see* 20 C.F.R. §404.1527(c)(2) (eff. April 1, 2012); Social Security Ruling 96-2P, 1996 WL 374188 at *1 (July 2, 1996).  "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence."  *Gayheart*, 710 F.3d at 376 (citation omitted).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of

12

medical opinion." *Id*. (citing 20 C.F.R. §404.1527(c)(6) (eff. April 1, 2012)).

The ALJ evaluated the opinions provided by Dr. Pema, Knapke's treating physician, as follows:

> On August 2011, Dr. Pema completed a medical statement regarding [Knapke's] ankle and foot problems. It is important to note the form was completed shortly after her left non-displaced fracture of the left tibial and fibular malleolus and peronesis brevis tear. He predicted a solid fusion within one year of surgery or March 2012. He deferred the question of whether rehabilitation would be needed until full healing had occurred. He reported limitations with standing, sitting, lifting, and leg elevation but noted rather emphatically on three separate occasions that her limitations and abilities would need to be determined by a functional capacity test, which could take place in March 2012, or one year after surgery. The undersigned finds the limitations suggest are indicative or her condition shortly after surgery and not when there was fulling healing as suggested by Dr. Pema. Accordingly, the undersigned gives this assessment little weight.

(Doc. #7, PageID at 1550).

There are several problems with ALJ's rejection of Dr. Pema's opinions. First, the ALJ's main criticisms of Dr. Pema's conclusions relate to the chronological proximity of surgery performed on Knapke's ankle/foot surgery in March 2011 and her projected recovery therefrom. But Knapke did not undergo such surgery. The record contains no evidence of any surgical procedures in March 2011 involving either of Knapke's ankles or feet. Considering that no such surgery took place, any failure on the part of Dr. Pema to account for Knapke's recovery from surgery cannot stand as a good reason to reject his opinions. Further, the ALJ's remarks regarding this illusory surgery belie the conclusion that the ALJ reasonably considered and understood the evidentiary record as it relates to Dr.

13

Pema's opinions.

The ALJ also erred by weighing only a small fraction of Dr. Pema's opinions. The ALJ's evaluation is limited to Dr. Pema's "August 2011 … medical statement…" *Id*. at 1550.  The ALJ's decision thus fails to consider the fact that in March 2012, Dr. Pema "revised" his August 2011 opinions. *See id*. at 2843.  The one paragraph containing the ALJ's evaluation of Dr. Pema's opinions did not mention or assess the weight due to Dr. Pema's responses in the December 2010 questionnaire.  The ALJ also did not evaluate Dr. Pema's opinions in light of the findings during Knapke's functional capacity evaluation from Drayer Physical Therapy Institute.  This means that even if the ALJ had properly weighed Dr. Pema's August 2011 opinions, which he did not, he still erred in neglecting to weigh the other substantive opinions provided by this treating physician.

Additionally, the ALJ's decision does not reflect that he weighed Dr. Pema's opinions under the two-step analysis applicable by law to the opinions of treating physicians. *See Gayheart*, 710 F.3d  at 376; *see* 20 C.F.R. §§404.1527(c)(2)-(5).  Instead, the ALJ's mistaken belief that Dr. Pema's opinions were connected to, and proximate to, a non-occurring March-2011 surgery leaves his evaluation without meaningful consideration of whether controlling weight was due Dr. Pema's opinions under the treating physician rule, and, if not, what regulatory factors supported the ALJ's decision to place only "little weight" on Dr. Pema's opinions.  Without such meaningful consideration of Dr. Pema's opinions under the legal criteria applicable to a treating physician, and in the presence of the

14

ALJ's mistake concerning a March 2011 surgery that did not occur, the ALJ's decision lacks good reasons in support of the "little weight" he placed on Dr. Pema's opinions.

The Commissioner contends that the ALJ's error in finding that Knapke underwent surgery in March 2011 was harmless error. The Commissioner maintains, "The Court does not remand a case if there is no reason to believe that remand might lead to a different result." (Doc. #12 at 2891) (citations omitted). A review of the opinions and records provided by Dr. Pema reveals no indication that his opinions are "so patently deficient that the Commissioner could not possibly credit it...." on remand. *Wilson*, 378 F.3d at 547. There is, instead, much evidence supporting Dr. Pema's opinions about Knapke's work limitations. During Knapke's asserted period of disability, Dr. Pema – who is a podiatrist and therefore a specialist – served as her main source of medical care. *See* Doc. #7 at 2447-537, 2650-52, 2737-43, 2811-12. Treatment notes reveal that Knapke frequently saw Dr. Pema since 2008 and, as a result, they had a long-term and ongoing treatment relationship. *Id*. The record further reveals that Dr. Pema recorded abnormal clinical signs and findings in Knapke's lower extremities during many of her office visits, including joint subluxation, edema/swelling, volar plate instability, diminished sensation/reflexes, and/or joint effusion. *See id*. at 2447, 2450-51, 2465, 2468-69, 2472-73, 2476, 2478, 2488-89, 2492-94, 2497-98, 2504-05, 2509, 2651-52, 2737, 2811-12. In light of such evidence, it is far from clear that the Commissioner could not possibly credit Dr. Pema's opinions on remand. Thus, the ALJ's error was not harmless.

15

The Commissioner also contends that Dr. Pema did not express any medical opinion in his response to the December 2010 questionnaire and, consequently, the ALJ did not err in regard to these responses by Dr. Pema.  This is unpersuasive.  The Regulations define "medical opinions" to include "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Given this definition, a physician's statements need not describe specific "functional limitations" to constitute a medical opinion.  *See id.*  Dr. Pema's December 2010 questionnaire responses reflect a number of judgments about the nature and severity of Knapke's impairments.  For instance, Dr. Pema not only recounts Plaintiff's symptomology and relevant clinical findings but also describes to what underlying physiology the same are related.  (Doc. #7 at 2648-49).  Dr. Pema explains that Knapke requires an ambulatory aid for biomechanical control of her gait.  *Id.*  And Dr. Pema indicates that the intensity and persistence of Knapke's symptoms are something he customarily sees in association with the degree of Knapke's physical findings.  *Id.* at 2649.  No reasonable reading of 20 C.F.R. §404.1527(a)(2) could result in the conclusion that Dr. Pema's responses to the December 2010 questionnaire are devoid of medical opinions.

The Commissioner contends that the ALJ reasonably gave "significant" weight to the opinion of Dr. Danopulos, a one-time examining physician.  The Commissioner reasons,

16

"Though Dr. Danopulos did not give specific exertional restrictions in his opinion, he determined that [Knapke] was not precluded from all work, though her ability to do work-related activities was affected in a 'negative' way by her impairments."  (Doc. #12 at 2892). The Commissioner's reading of Dr. Danopulos's report stretches his opinions too far. Although the Commissioner correctly acknowledges the absence of specific work limitations in Dr. Danopulos's report, the Commissioner draws the unreasonable inference that Dr. Danopulos believed that Knapke was "not precluded from all work ...."  *Id*.  Dr. Danopulos's report listed objective findings without connecting them in an analytical way to his conclusion that Knapke's "ability to do any work-related activities is affected in a negative way ..." by her impairments.  *See id*.  Dr. Danopulos also neglected to explain, or add specific work restrictions to illuminate, how Knapke's work-related activities were negatively affected by her impairments.  *See* Doc. #7 at 2667.  Without such information, the meaning of Dr. Danopulos's phrase "negative way" falls somewhere on a relative continuum from a person having no ability to work, to having the ability to do some work activities (but which ones?), to the ability to do many or even most work activities (but which ones?).  Because Dr. Danopulos's report provides no insight into Knapke's actual work abilities and limits, it does not constitute substantial evidence in support of the ALJ's assessment of Knapke's residual functional capacity.  *See Blakley*, 581 F.3d at 407 (substantial-evidence standard is met "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  (citation omitted)).

17

Perhaps more significantly, the ALJ's decision does not discuss what regulatory factors he applied to Dr. Danopulos's opinions.  This constituted a failure to apply the correct legal criteria because the Regulations and Rulings required the ALJ to weigh the opinions of one-time examining physicians and record-reviewing physicians under the regulatory factors, including supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1527(c), (e); *see also* Social Security Ruling 96-6p, 1996 WL 374180.  The Regulations appear to emphasize this requirement by reiterating it no less than three times. *See* 20 C.F.R. §404.1527(c) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see also* 20 C.F.R. §404.1527(e)(1)(ii) (relevant factors apply to opinions of state agency medical consultants); 20 C.F.R. §404.1527(e)(2)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

Accordingly, Knapke's Statement of Errors is well taken.[7]

## C.     Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89,

---

[7] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Knapke's remaining challenges to the ALJ's decision is unwarranted.

18

99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Knapke, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above.  On remand the ALJ should be directed to (1) evaluate all medical source opinions and other evidence of record under the legal criteria set forth in the Commissioner's Regulations and Rulings and as mandated by case law; and (2) review Knapke's disability claim under the required five-step sequential analysis to determine anew whether she was under a disability and thus eligible for DIB.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Renee Knapke was under a "disability" within the meaning of the Social Security Act;

3.    This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.


January 6, 2015        s/Sharon L. Ovington
               Sharon L. Ovington
           Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).